Citation Nr: 1134100 
Decision Date: 09/12/11 Archive Date: 09/22/11

DOCKET NO. 05-31 436 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Houston, Texas


THE ISSUE

Entitlement to disability compensation pursuant to 38 U.S.C. § 1151, for disability manifested by back pain, claimed as secondary to arachnoiditis from residual myelogram dye.


REPRESENTATION

Veteran represented by: Texas Veterans Commission


WITNESS AT HEARING ON APPEAL

Veteran


ATTORNEY FOR THE BOARD

Jebby Rasputnis, Associate Counsel
INTRODUCTION

The Veteran served on active duty from October 1952 to August 1954.

This matter was last before the Board of Veterans' Affairs (Board) in April 2011, on appeal from a June 2003 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Houston, Texas.

The Veteran testified before a Veterans Law Judge (VLJ) in Denver, Colorado, in August 2006. In September 2006, the Board remanded the Veteran's claim for additional development; when the claim was returned to the Board, the VLJ who conducted the 2006 hearing was no longer employed by VA. Pursuant to 38 C.F.R. § 20.707 (2010), the Veteran was offered the opportunity to testify at another hearing. In March 2009, his claim was remanded for the provision of that hearing. In August 2009, he testified before the below-signed VLJ at the Houston RO. A transcript of that hearing is within the claims file. In September 2009, the Board again remanded the claim in order to obtain a specialist's medical opinion. In April 2011, the Board remanded the claim due to lack of compliance with the terms of the September 2009 remand.

Please note this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2010). 38 U.S.C.A. § 7107(a)(2) (West 2002).


FINDINGS OF FACT

1. The Veteran is competent to report his experiences in 1978 and his subsequent symptoms, but his reports are not credible.

2. The preponderance of the competent evidence of record shows that the Veteran's back disability is not due to fault on the part of VA in furnishing hospital care, medical or surgical treatment, or examination, nor was it the result of an event not reasonably foreseeable.


CONCLUSION OF LAW

The criteria for entitlement to compensation under the provisions of 38 U.S.C.A. § 1151 for a back disability as the result of a myelogram performed at a VAMC in June 1978 have not been met. 38 U.S.C.A. §§ 1151, 5103, 5103A, 5107 (West 2002 & Supp. 2010); 38 C.F.R. 3.361 (2010).


REASONS AND BASES FOR FINDINGS AND CONCLUSION

The Board will discuss the relevant law which it is required to apply. This includes statutes published in Title 38, United States Code ("38 U.S.C.A."); regulations published in the Title 38 of the Code of Federal Regulations ("38 C.F.R.") and the precedential rulings of the Court of Appeals for the Federal Circuit (as noted by citations to "Fed. Cir.") and the Court of Appeals for Veterans Claims (as noted by citations to "Vet. App.").

The Board is bound by statute to set forth specifically the issue under appellate consideration and its decision must also include separately stated findings of fact and conclusions of law on all material issues of fact and law presented on the record, and the reasons or bases for those findings and conclusions. 38 U.S.C.A. § 7104(d); see also 38 C.F.R. § 19.7 (implementing the cited statute); see also Vargas-Gonzalez v. West, 12 Vet. App. 321, 328 (1999); Gilbert v. Derwinski, 1 Vet. App. 49, 56-57 (1990) (the Board's statement of reasons and bases for its findings and conclusions on all material facts and law presented on the record must be sufficient to enable the claimant to understand the precise basis for the Board's decision, as well as to facilitate review of the decision by courts of competent appellate jurisdiction. The Board must also consider and discuss all applicable statutory and regulatory law, as well as the controlling decisions of the appellate courts).



Duties to Notify and Assist

Under the Veterans Claims Assistance Act of 2000 (VCAA), VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2002 & Supp. 2009); 38 C.F.R. §§ 3.102, 3.156(a), 3.159 and 3.326(a) (2010). VCAA notice must inform a Veteran of the evidence necessary to substantiate his claim and that a disability rating and an effective date will be assigned if there is a favorable disposition of the claim. Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006); 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107; 38 C.F.R. §§ 3.159, 3.326; see also Pelegrini v. Principi, 18 Vet. App. 112, 120-21 (2004) (Pelegrini II).

In an April 2003 letter, VA informed the Veteran of the evidence necessary to substantiate his claim for benefits under 38 U.S.C.A. § 1151. The letter informed him of the evidence VA would seek on his behalf and the information and evidence for which the Veteran was responsible.

A September 2006 letter provided the Veteran with notice of how VA would establish a disability rating and assign an effective date if his claim was granted. See Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). This notice was not sent to the Veteran prior to the initial rating decision, but the RO subsequently readjudicated the claim in October 2008, February 2011, and July 2011 supplemental statements of the case. See Mayfield v. Nicholson, 499 F.3d 1317 (Fed. Cir. 2007). 

Treatment records, examination reports, private medical opinions, and hearing transcripts have been associated with the claims file. VA has a duty to ensure that its examinations and medical opinions are adequate. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). The VA examination reports and medical opinions are adequate: they are predicated on review of the claims folder, treatment records, and the Veteran's contentions; they provide reasoned medical opinions and contain adequate statements of the reasons and bases for the opinions rendered. Although some of the opinions were inconclusive and called for expert review, additional review and opinions were obtained on remand. VA's duty to assist has been met. 38 C.F.R. § 3.159(c)(4). 

The Veteran's claim was remanded on multiple occasions: in September 2006, the Board directed the RO/AMC to obtain additional treatment records and provide the Veteran with a VA examination; in March 2009, the Board directed that the RO schedule the Veteran for a second hearing; in September 2009, the Board remanded the claim for an expert medical opinion; and in April 2011, the Board remanded the claim for compliance with the September 2009 directive. Additional records have been added to the claims file, VA examinations were conducted and extra opinions were provided, and the Veteran received two (2) hearings. The Board finds that all actions and development directed in the prior remands have been completed. Dyment v. West, 13 Vet. App. 141, 146-47 (1999).

In sum, the record reflects that the facts pertinent to the claim have been properly developed and that no further development is required to comply with the provisions of the VCAA or the implementing regulations. That is to say, "the record has been fully developed," and it is "difficult to discern what additional guidance VA could [provide] to the [Veteran] regarding what further evidence [s]he should submit to substantiate [his] claim." Conway v. Principi, 353 F. 3d. 1369 (Fed. Cir. 2004). The Board additionally finds that general due process considerations have been complied with by VA. See 38 C.F.R. § 3.103 (2010). Accordingly, the Board will adjudicate the claim on the merits.

Compensation under 38 U.S.C.A. § 1151

A Veteran may be awarded VA compensation for disability caused by VA medical care in the same manner as if that disability was service-connected. 38 U.S.C.A. § 1151. A disability is considered a qualifying disability if it was not the result of the Veteran's willful misconduct and if it was caused by hospital care, medical or surgical treatment, or examination furnished the Veteran under any law administered by VA and the proximate cause of the disability was carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of VA in furnishing the hospital care, medical or surgical treatment, or examination; or, an event not reasonably foreseeable. Id. See also VAOPGCPREC 40-97.

38 C.F.R. § 3.361(b) states that to determine whether a veteran has such a disability due to VA medical care, VA compares a veteran's condition immediately before the beginning of the hospital care or medical or surgical treatment upon which the claim is based to the condition after such care or treatment. 38 C.F.R. § 3.361(b). VA considers each involved body part or system separately.

38 C.F.R. § 3.361(c) states that claims of disability due to hospital care, medical or surgical treatment, or examination must meet the causation requirements of that paragraph and paragraph (d)(1) or (d)(2) of that section. Claims based on disability due to training and rehabilitation services or compensated work therapy program must meet the causation requirements of paragraph (d)(3) of this section. 

Actual causation is required. To establish causation, the evidence must show that the hospital care, medical or surgical treatment, or examination resulted in the Veteran's disability. Merely showing that a veteran received care, treatment, or examination and has an additional disability does not establish causation. Continuance or natural progress of a disease or injury for which the care, treatment, or examination was furnished is not considered additional disability unless VA's failure to timely diagnose and/or properly treat the disease or injury proximately caused the continuance or natural progress. Additional disability caused by a veteran's failure to follow properly given medical instructions is not caused by hospital care, medical or surgical treatment, or examination.

38 C.F.R. § 3.361(d) states that the proximate cause of disability is the action or event that directly caused the disability, as distinguished from a remote contributing cause. To establish that VA carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault proximately caused a veteran's additional disability, VA care must be shown to have caused the additional disability (as explained in paragraph (c) of this section) and there must be evidence that (i) VA failed to exercise the degree of care that would be expected of a reasonable health care provider; or (ii) VA furnished the hospital care, medical or surgical treatment, or examination without the veteran's (or, in appropriate cases, the veteran's representative's) informed consent. 

Generally, all patient care furnished by VA shall be carried out only with the full and informed consent of the patient or, in appropriate cases, a representative thereof. In order to give informed consent, the patient must have decision-making capacity and be able to communicate decisions concerning health care. 38 C.F.R. § 17.32(b). The informed consent process must be appropriately documented in the medical record. 38 C.F.R. § 17.32(d).

Whether the proximate cause of a veteran's additional disability was an event not reasonably foreseeable is in each claim to be determined based on what a reasonable health care provider would have foreseen. The event need not be completely unforeseeable or unimaginable but must be one that a reasonable health care provider would not have considered to be an ordinary risk of the treatment provided. In determining whether an event was reasonably foreseeable, VA will consider whether the risk of that event was the type of risk that a reasonable health care provider would have disclosed in connection with the informed consent procedures of § 17.32. 

The Veteran alleges that a June 1978 myelogram performed at a VA Medical Center (VAMC) resulted in a disability of his lumbosacral spine. The record reflects that the Veteran experienced sudden deafness of his left ear in June 1978. Examination of the ear did not show any cause for the deafness and conservative treatment did not improve the hearing loss. A myelogram was ordered to rule out the possible existence of an acoustic neuroma. The record reflects that, prior to the myelogram, the Veteran was in stable condition and was not complaining of pain, nausea, or vomiting. Immediately following the myelogram, the Veteran reported feeling numb at the injection site and experiencing headache. Treatment notes reflect that he was alert and oriented and in no acute distress, but was monitored to ensure that he could move his extremities; no neurologic injury was observed. Upon hospital discharge after the myelogram, the Veteran indicated that he felt "fine" and would return in a month for another hearing test. His discharge note reflects that he was ambulatory and did not have any health complaints.

In July 1978, the Veteran returned for additional treatment from the VAMC neurology department and reported pain in his back and legs that he contended began three (3) days after the myelogram. Initially, he was assessed with possible arachnoiditis, but subsequent records reveal that a VA physician opined that onset of the symptoms was too early to be "true arachnoiditis." The Veteran was provided with pain relief. An August 1978 treatment note states that there had been much improvement in the Veteran's lower extremity pain. There are no records indicating that additional treatment was provided for any back pain prior to December 1978.

In December 1978, the Veteran was involved in a motor vehicle accident and sought VA treatment for back pain; he attributed the pain to muscle spasm and denied radiating pain. He was diagnosed with a back sprain. In January 1979, he returned for treatment and notes indicate that he reported being unable to "do anything" without pain since the December 1978 accident. X-rays did not reveal any abnormalities and the Veteran was referred back to the neurology department. A February 1979 note from the neurology department reflects that examination was unremarkable and physicians doubted that the etiology of the Veteran's pain was neurologically based. He was diagnosed with chronic pain and referred to the VAMC pain clinic.

An April 1979 pain clinic note observes that the Veteran had been evaluated by the orthopedic and neurology departments, but no physical abnormalities were found. A rehabilitative medicine note states that evaluation revealed a possible emotional component to the Veteran's complaints as well as some exaggeration of pain in response to range of motion testing. A May 1979 pain clinic note states that the Veteran reported his back pain was "as bad as ever."

The Veteran submitted a September 2000 letter to VA stating that he did not experience any back pain until mid-June 1978. He reported that he had experienced disabling back pain ever since the myelogram. He stated that he made multiple unscheduled trips to VA for treatment due to back pain. The Veteran reported that, on one occasion, the pain was so extreme that he was mis-diagnosed with internal bleeding, bruised and cracked ribs, and a punctured liver. He stated that x-rays were performed and the attending physician noted no such injuries, but asked him "what are you doing with that dye in your back?"

In June 2002, the Veteran was seen by VA with complaints of back pain that he again attributed to the 1978 myelogram. The treatment note states that the Veteran also reported that he had experienced left-sided hearing loss since the myelogram.

A September 2004 private medical opinion observes that the Veteran did not experience back pain prior to the 1978 myelogram. The physician stated that thecal sac scarring or adhesive arachnoiditis often resulted from myelograms due to the dye that was used prior to 1979. He opined that the Veteran's chronic back pain was likely the result of adhesive arachnoiditis from the myelogram dye. An October 2004 letter from the same physician opines that the Veteran's condition was permanent.

In August 2006, the Veteran testified before a former Veterans Law Judge. He repeated his contentions that he had experienced disabling back pain ever since the 1978 myelogram.

The Veteran was afforded a VA examination in January 2007. The examination report reflects that he informed the examiner that he experienced back pain after the June 1978 myelogram and that pain was not changed by the December 1978 motor vehicle accident. Based on the Veteran's report of "unremitting back pain" since the June 1978 myelogram, the examiner stated that chronic back pain was likely attributable to the residuals, arachnoiditis, of that procedure. The examiner adopted the reasoning of the September 2004 private physician, but stated that etiology "could not be proven without a doubt." An August 2008 addendum to the January 2007 examination report provided additional detail. Specifically, the examiner stated in August 2008 that summaries of the myelogram revealed no problems during or immediately after the procedure, but observed there was no report detailing the procedure. He also stated that myelograms were likely standard practice during 1978, but could not say whether or not the physician conducting the procedure was familiar with myelograms. He stated that a neurosurgeon would be better able to provide an opinion.

In September 2008, another opinion was obtained. The VA reviewer noted nothing in the record to suggest any problems with the myelogram procedure, but noted that the dye that was used was known to pose a slight risk of arachnoiditis. He explained that two (2) types of complications can result from use of the dye: immediate transient symptoms similar to meningitis; and later-developing arachnoiditis symptoms. The reviewer noted a signed informed consent form within the claims folder and a lack of any evidence of immediate post-procedure complications. Although opining that the myelogram likely resulted in the Veteran's back pain, the reviewer stated that VA was not likely at fault. The reviewer based that opinion on the lack of evidence of any carelessness or negligence and because arachnoiditis was not a reasonably unforeseeable result.

In August 2009, the Veteran testified before the below-signed Veterans Law Judge. He testified that he signed a consent form, but was not informed of the risks of the myelogram prior to undergoing the procedure. The Veteran described the myelogram and stated that the physician performing the procedure "hit something" in his back during the procedure and caused him a "jolt." He reported that a few days after the procedure (after his discharge from the hospital) his head froze in an upward position and he returned to the hospital. He testified that VA physicians informed him that he was experiencing problems from the myelogram. The Veteran reported disabling back pain ever since that incident. When asked about the December 1978 motor vehicle accident, the Veteran indicated that he did not experience additional injury from that accident - he reported experiencing the same back pain prior to and after the collision.

Veteran's claims file was provided to a VA examiner in December 2009 pursuant to a September 2009 Board directive to obtain a medical opinion from a "qualified neurologist or otolaryngologist." The resulting report reflects that the examiner read the Veteran's treatment record and prior medical opinions. The examiner, a family practice allopathic and osteopathic physician, did not provide an independent assessment of the evidence, but stated that he concurred with the September 2008 VA medical opinion.

In April 2011, the Board again directed that the claims file be provided to a specialist for the provision of a medical opinion. In May 2011, the AMC returned the Veteran's claims file to the January 2007 VA examiner. The VA examiner stated again that he was "unable to offer any more clarity or guidance on this matter due to the technical nature of the questions being asked." The examiner again recommended consulting with a specialist (neurosurgeon, neuroradiologist, ENT surgeon, or radiologist). 

A neurosurgeon examined the claims file in July 2011. The resulting report provides a detailed history of the Veteran's treatment and contentions. The examiner observed that the first post-myelogram treatment note was dated approximately one (1) month after the procedure and reflected the Veteran's complaints of lumbar pain. That treatment note shows a normal neurological evaluation with intact, full strength, sensory examination, but paraspinal spasms. Although the note states a provisional diagnosis of arachnoiditis secondary to the myelogram, the 2011 examiner stated that more than one (1) month's time is required for arachnoiditis to manifest. The examiner opined that the symptoms reflect "spinal headache" - pain in the head, neck, and back due to low cerebrospinal fluid pressure level. Because there was no radiological evidence of arachnoiditis, the symptoms manifested too quickly to be arachnoiditis, and physical examination showed full strength and normal sensation, the examiner opined that the provisional diagnosis of arachnoiditis was incorrect. 

The July 2011 examiner noted that the Veteran had received an MRI in 2007 which showed no evidence of any residual dye or arachnoiditis. The MRI showed only age appropriate degenerative changes and, in the opinion of the examiner, no physical origin for the Veteran's chronic back pain complaints. As no treatment records generated at the time of the myelogram suggested any complications or lack of VA care, the Veteran is not shown to experience any sensorimotor deficits (other than minor deficits due to a decade-old cerebrovascular accident), and there was no radiologic evidence of arachnoiditis, the examiner opined that VA was not at fault for any back pain experienced by the Veteran.

In evaluating the Veteran's claim, the Board primarily relies on the thorough file review and reasoned opinion provided by the July 2011 VA examiner. Colvin v. Derwinski, 1 Vet. App. 171, 175 (1991) (the Board must rely on an informed medical opinion in order to adjudicate a claim); Prejean v. West, 13 Vet. App. 444, 448-9 (2000) (recognizing that factors for assessing the probative value of a medical opinion are the physician's access to the claims file and the thoroughness and detail of the opinion). The July 2011 examiner was a specialist, a neurosurgeon, and the probative value of medical opinions also is based on the physician's knowledge and skill in analyzing the data, and the medical conclusion the physician reaches. Guerrieri v. Brown, 4 Vet. App. 467, 470 (1993). The credibility and weight to be attached to these opinions is within the province of the Board. Id. The opinion of the July 2011 examiner is supported by the objective medical evidence of record.

The evaluation of evidence generally involves a 3-step inquiry. First, the Board must determine whether the evidence comes from a "competent" source. The Board must then determine if the evidence is credible, or worthy of belief. Barr v. Nicholson, 21 Vet. App. 303 at 308 (2007) (Observing that once evidence is determined to be competent, the Board must determine whether such evidence is also credible). The third step of this inquiry requires the Board to weigh the probative value of the proffered evidence in light of the entirety of the record. 

Competent lay evidence means any evidence not requiring that the proponent have specialized education, training, or experience. Lay evidence is competent if it is provided by a person who has knowledge of facts or circumstances and conveys matters that can be observed and described by a lay person. 38 C.F.R. § 3.159. Lay evidence may be competent and sufficient to establish a diagnosis of a condition when:

(1) a layperson is competent to identify the medical condition (i.e., when the layperson will be competent to identify the condition where the condition is simple, for example a broken leg, and sometimes not, for example, a form of cancer);

(2) the layperson is reporting a contemporaneous medical diagnosis, or;

 (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional. 

Jandreau v. Nicholson, 492 F. 3d 1372 (Fed. Cir. 2007); see also Davidson, 581 F.3d 1313. 

In ascertaining the competency of lay evidence, the Courts have generally held that a layperson is not capable of opining on matters requiring medical knowledge. Routen v. Brown, 10 Vet. App. 183 (1997). In certain instances, however, lay evidence has been found to be competent with regard to a disease with "unique and readily identifiable features" that is "capable of lay observation." See, e.g., Barr v. Nicholson, 21 Vet. App. 303 (2007) (concerning varicose veins); see also Jandreau v. Nicholson, 492 F. 3d 1372 (Fed. Cir. 2007) (a dislocated shoulder); Charles v. Principi, 16 Vet. App. 370 (2002) (tinnitus); Falzone v. Brown, 8 Vet. App. 398 (1995) (flatfeet). Laypersons have also been found to not be competent to provide evidence in more complex medical situations. See Woehlaert v. Nicholson, 21 Vet. App. 456 (2007) (concerning rheumatic fever). 

Competent medical evidence is evidence provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions. Competent medical evidence may also include statements conveying sound medical principles found in medical treatises. It also includes statements contained in authoritative writings, such as medical and scientific articles and research reports or analyses. 38 C.F.R. § 3.159(a)(1).

After determining the competency and credibility of evidence, the Board must then weigh its probative value. In this function, the Board may properly consider internal inconsistency, facial plausibility, and consistency with other evidence submitted on behalf of the claimant. Caluza v. Brown, 7 Vet. App. 498, 511-512 (1995), aff'd, 78 F.3d 604 (Fed. Cir. 1996) (per curiam) (table); see Madden v. Brown, 125 F.3d 1447 (Fed Cir. 1997) (holding that the Board has the "authority to discount the weight and probative value of evidence in light of its inherent characteristics in its relationship to other items of evidence").

The Board finds that the Veteran is competent to report factual matters of which he had first-hand knowledge, e.g., experiencing pain, reporting for health care treatment, and undergoing medical procedures. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005). However, he is not credible - he reported returning to the hospital for treatment of head and neck paralysis "a few days" after the myelogram, but the record shows he did not return until approximately a month later; he contended that he experienced the same back pain before and after the December 1978 motor vehicle accident, but contemporaneous treatment records show that he had back pain complaints specific to the accident that was distinct from the radiating back pain he described and attributed to the myelogram; he testified that VA x-rays showed the presence of dye in his back, but all VA radiologic evidence shows a normal back. See Caluza, 7 Vet. App. at 511-512. The Veteran also has not indicated that he possesses any medical training rendering him competent to opine as to whether VA treatment was inadequate; that type of opinion must be based on competent medical evidence. See Routen, supra. 

The Veteran has further contended that he was not informed of the risks involved with the myelogram procedure. However, a June 16, 1978 treatment note reflects that he was instructed about the procedure and was encouraged to "ask questions and verbalize feeling." Further, a signed consent form appears in the record. The form is dated June 14, 1978 and shows that the Veteran attested that he understood "the nature of the proposed procedure, attendant risks involved, and expected results." Caluza, 7 Vet. App. at 511-512. The record shows that the Veteran was able to give informed consent and that the consent process was appropriately documented. See 38 C.F.R. § 17.32(d).

The Federal Circuit has held that lay evidence is one type of evidence that must be considered. Although competent lay evidence can be sufficient, the Board retains the discretion to make credibility determinations and otherwise weigh the evidence submitted, including lay evidence. See Buchanan, 451 F.3d at 1335. The Veteran's personal interest in his claim may affect the credibility of his testimony. Cartwright v. Derwinski, 2 Vet.App. 24, 25 (1991).

As noted above, compensation will be provided for a disability resulting from VA hospital care, medical or surgical treatment, or examination when the proximate cause of the disability was carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of VA. Compensation will also be provided for disability resulting from VA care if the event was not reasonably foreseeable. The claims file does not reflect any indication that the VA health care providers who administered the 1978 myelogram were careless, negligent, lacked proper skills, or made errors in judgment. Although the Veteran testified that he felt a cold chill during the procedure, the July 2011 VA examiner and multiple other health care providers have noted that there was nothing in the record to suggest any complications with the procedure.

The record reflects that the Veteran did not experience any back pain prior to the myelogram and did not have any evidence of nerve damage after the procedure. 38 C.F.R. § 3.361(b). Although the claims file shows that the Veteran did receive a myelogram and complained of back pain approximately one (1) month later, the preponderance of the competent evidence is against a finding of any causation. The July 2011 examiner opined that pain experienced by the Veteran subsequent to the procedure was likely due to low cerebrospinal fluid pressure and noted that there was no radiologic evidence of any arachnoiditis. Specifically, the 2011 examiner explained that any such condition would be evident on MRI and a 2007 MRI was normal.

Even assuming that the Veteran did experience arachnoiditis due to the myelogram, there is no evidence of VA fault. Further, health care providers have stated that damage caused by residual myelogram dye is the type of risk that a reasonable health care provider would have disclosed in connection with the informed consent procedures of § 17.32. The Board has the fundamental authority to decide a claim in the alternative. See Holbrook v. Brown, 8 Vet. App. 91 (1995).

Based on the above, the preponderance of the evidence of record is against finding any evidence of carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of VA in treating the Veteran. No medical professional has determined, including the 2004 private physician, that VA health care providers were careless, negligent, or lacking in skill. Although the private physician and some VA physicians have opined that the Veteran experiences arachnoiditis, they have not opined that arachnoiditis was caused by VA fault or was an event not reasonably foreseeable. The most probative evidence of record - the negative neurologic and orthopedic testing performed in 1978 and 1979, the lack of radiologic evidence of any residual dye or arachnoiditis, and the opinion of the July 2011 neurosurgeon - is against a finding that the Veteran experienced back disability due to the 1978 myelogram. For these reasons, a grant of disability compensation pursuant to 38 U.S.C.A. § 1151 is not in order.

As the preponderance of the evidence is against the claim, the benefit of the doubt rule is not applicable. See 38 U.S.C.A. § 5107(b); Gilbert v. Derwinski, 1 Vet. App. 49, 54-56 (1990).


ORDER

Compensation pursuant to the provisions of 38 U.S.C.A § 1151 for a back disability is denied.



____________________________________________
Vito A. Clementi
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs